509 So.2d 622 (1987)
Jannery Lemaire CHAUVIN, Individually as Surviving Spouse of Lennis J. Chauvin, and as Natural and Duly Appointed Tutrix of the Minor Children, Michelle Reneé Chauvin and Nichole Simone Chauvin, Plaintiff-Appellant,
v.
GULF COAST MINERALS, INC., Gulf Associates of Louisiana, Inc., Gulf Water Systems, Inc., Highlands Insurance Company, Clarence Eugene Whipp, Jr., Southern Structures, Inc., Liberty Mutual Insurance Company and Ronald Thibodeaux d/b/a Ronald Thibodeaux Electrical Service, Defendants-Appellees.
No. 86-438.
Court of Appeal of Louisiana, Third Circuit.
May 13, 1987.
Writ Denied October 2, 1987.
*623 Donald G. Cave, of Cave and McKay, Baton Rouge, for plaintiff-appellant.
Onebane and Assoc., Keith M. Borne, V. Farley Sonnier and John E. McElligott, Jr., of Davidson, Voorhies and Labbe, James P. Lambert, Lafayette, Joseph Touchet, Erath, Bertrand and Soileau, Ronnie J. Bertrand, Rayne, for defendants-appellees.
Before STOKER, LABORDE and YELVERTON, JJ.
STOKER, Judge.
Lennis J. Chauvin was electrocuted on July 18, 1979 while in the course and scope of his employment with Quality Steel Building Erectors, Inc. Quality's worker's compensation insurer paid benefits to his survivors. Chauvin's widow, Jannery Lemaire Chauvin, brought this wrongful death action individually and on behalf of the couple's two children against several defendants, alleging that their acts or instrumentalities had caused his death. Some of the defendants were dismissed after settling with the plaintiff. At the time of trial, only two defendants remained, Southern Structures, Inc., from which Quality had been formed, and Liberty Mutual Insurance Company, Southern Structures' general liability insurer.
The jury found negligence on the part of Southern Structures, Joseph Villy Touchet, C.E. Whipp and Gulf Water Systems. No percentages of liability were assigned. The jury awarded $515,000 in general damages to Mrs. Chauvin and the two children.
The trial judge found that as a matter of law Southern Structures was the statutory employer of Chauvin, and could not be held liable in tort for his death. He dismissed the claims against Southern Structures and Liberty Mutual. Mrs. Chauvin appeals.

FACTS
Before July 1, 1979 Southern Structures manufactured steel buildings regionally, and offered erection services within a limited radius of Lafayette, Louisiana. Southern Structures was contacted by C.E. Whipp, who was interested in the construction of a building for Gulf Water Systems, of which Whipp owned 51% of the stock. Steven Landry, a Southern Structures salesman, presented a quotation to J.B. Touchet, president of Gulf Water Systems, which contained an initial proposal and an alternative. Touchet signed his name and the company's on November 13, 1978, ostensibly accepting the alternative proposal at $27,234. A space on the quotation providing for acceptance by Southern Structures was left blank. However, the purchase order was entered, and Southern Structures fabricated the building.
The building was manufactured sometime in January of 1979, and Gulf Water Systems was billed for 75% of the contract price on February 28, 1979. Gulf Water Systems experienced difficulty in securing financing for the project, of which this building represented 25% of the total expense. Delivery to the erection site was delayed until after the financing was approved in June.
Meanwhile, Southern Structures had decided to limit its operation to the fabrication of metal buildings. As of July 1, 1979, a new company, Quality Steel Building Erectors, Inc., was formed to perform the erection services formerly offered by Southern Structures. Southern Structures and Quality were to be independent enterprises, though both had the same owner and the same officers. Initially, Southern Structures leased its "rolling stock" (i.e., pickup trucks and cherry pickers) to Quality.
*624 This stock was sold to Quality in December of 1980. No inventory was kept of tools and equipment on the trucks. These items evidently were allowed to remain on the trucks during the period of leasing and were "given" to Quality when the sale took place. The employees in Southern Structures' erection division considered themselves employees of Quality as of July 1, 1979. Southern Structures arranged for Quality to perform erection services on twenty or so contracts it had made prior to the formation of the new company. These arrangements were all verbal, and Southern Structures was to pay Quality the amounts allotted in its quotations for erection services. No new negotiations were to take place. Southern Structures continued to do the payroll and issue the paychecks to the erection employees for an undisclosed time after July 1, as Quality did not have an adequate bookkeeping system. Debits and credits were logged on Southern Structures' books as amounts "Due To" and "Due From" Quality. Once Quality's accounting procedures were established, the accounts were evidently settled.
On July 9, 1979 Southern Structures began shipping the building parts to the jobsite, and Quality began to erect the building. Timesheets show that Lennis Chauvin, a former Southern Structures' employee who had been "transferred" to Quality, worked on the job on July 17. He again worked on July 18, the day of the accident.
On the morning of July 18 Chauvin was driven to work by Alton LeBlanc, a co-employee. Both LeBlanc and Chauvin were foremen, and there is some question as to who was in charge of the job. LeBlanc, Chauvin and Ernest Primeaux, another Quality employee, proceeded to install guttering on the building. Midmorning, Chauvin was standing on a ladder using an electric drill when he screamed and fell to the ground. Apparently, no one witnessed the actual fall. Chauvin was unconscious when the other workers reached him. He was taken by ambulance to Lafayette General Hospital, where he died. The cause of death was listed as ventricular fibrillation secondary to electrocution.
An electrical engineer was called in by Liberty Mutual to determine the cause of the electrocution. He found that the power source for the drill used by Chauvin was located in a trailer about 300 feet from the metal building. Three extension cords were used to span the distance. The first cord was plugged into an outlet in the trailer, and was run out a window. It was connected to a six-receptable junction box. The second cord, also plugged into the junction box, was about two and one-half feet long. The third cord, which was about 74 feet long, had many nicks and cuts. At one point, wires were exposed and protruding around electrical tape. At another point, there was a bulge, which indicated a short. The drill was connected to this cord.
The engineer tested the drill, but found nothing wrong with it. He noted that the circuit in the trailer was not protected by a ground-fault circuit-interrupter (GFCI), the function of which he explained as follows:
"Basically, it senses the current leaving one conductor and it senses the current coming back to that same point, and of course, if there is no short or if the current doesn't leak off anywhere, then those should be equal. So, as long as those currents are equal or within a very close tolerance, it allows the circuit to be continued. If there's a difference in those two currents on the order of ten milliamps or more, the ground fault current interrupter circuit breaker will immediately trip and discontinue any current to that circuit."
He concluded:
"In my opinion the most probable cause of the accident was a short in cord No. 3 at point D caused by a slight bonding at the bulge previously mentioned. This energized the drill case since there was no grounding or GFCI protection. The victim was working on metal guttering which was an effective ground, and contact with the drill case with one hand and the guttering or metal building with the other could easily have cause [sic] a fatal shock."
Apparently, the drill and the extension cords came off of LeBlanc's truck. The *625 junction box belonged to Joseph Villy Touchet,[1] whose construction crew was also working on the site. There is no evidence as to who plugged the cord into the trailer outlet, or who laid out the extension cords.

NEGLIGENCE OF WHIPP AND TOUCHET
The jury found negligence on the part of C.E. Whipp and his company, Gulf Water Systems, and Joseph Villy Touchet. Although these defendants were dismissed from this action, a consideration of their negligence was necessary in order to determine the percentage of negligence attributable to others. We find manifest error in the jury's conclusion on this point, and we reverse.
C.E. Whipp and his employees arranged for the purchase of a metal building, and for the erection of that building. Whipp supplied the slab, and contracted for plumbing and electrical work. There was no electrical service to the metal building on the day of the accident.
Electricity to the trailer on the construction site was supplied by a utility pole near the trailer. Ed Dauphin, who was the building official for the City of Lafayette's Codes and Permits Department at the time of the accident, testified that building permits are issued prior to the commencement of construction, so there is no requirement of a GFCI at the time of issuance. Later, if a GFCI is not installed at a site at which it is required, construction can be shut down. However, Mr. Dauphin stated that while a GFCI is required where power is supplied to a construction site, none is required for a mobile home or trailer.
The trailer in this case was placed near the construction site to serve as temporary office space for Whipp and the employees of his three companies. There is no indication that Whipp envisioned that the trailer would serve as the source of power for the construction of the building. To the contrary, up until the day of the accident, Quality's crew had evidently provided its own power by means of a portable generator. No one seemed to know who plugged the first cord into the trailer, but Ernest Primeaux testified that the Quality crew laid out the equipment.
Since the power to the trailer was supplied in the proper manner for its use as such, and since there is no evidence that it was Whipp or one of his employees who decided to allow the trailer outlet to be used to supply power to the construction site, we find the jury's conclusion as to Whipp and his company to be manifestly erroneous.
Likewise, we find no negligence on the part of Joseph Villy Touchet, the contractor whose crew was performing carpentry work for Whipp. Apparently, Touchet's only role in this case was that he supplied the junction box into which the first and second cords were plugged. He did not own the cords themselves. There was no defect in the junction box. The evidence does not show that he was responsible for plugging the first cord into the trailer outlet. We fail to see any action on his part which could be considered negligent.

STATUTORY EMPLOYMENT
Mrs. Chauvin's second assignment of error is specifically aimed at one of the special interrogatories posed to the jury. However, the assignment raised the issue of statutory employment, which is the cause of heated debate in this case.
Interrogatory # 2 read, "If the answer to Question # 1 [asking whether Southern Structures had contracted to erect the metal building] is `yes,' was the contract to perform or provide?" The jury circled "to perform." The question was designed to determine whether Southern Structures qualified for statutory employment status.
LSA-R.S. 23:1061 states in part:
"Where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his *626 trade, business, or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; and where compensation is claimed from, or proceedings are taken against, the principal, then, in the application of this Chapter reference to the principal shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the employee under the employer by whom he is immediately employed."
LSA-R.S. 23:1032 provides in part:
"The rights and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents, or relations, against his employer, or any principal or any officer, director, stockholder, partner or employee of such employer or principal, for said injury, or compensable sickness or disease. For purposes of this Section, the word "principal" shall be defined as any person who undertakes to execute any work which is a part of his trade, business or occupation in which he was engaged at the time of the injury, or which he had contracted to perform and contracts with any person for the execution thereof."
The parties and the trial judge focused on the case of Duvalle v. Lake Kenilworth, Inc., 467 So.2d 850 (La.App. 4th Cir.1984), writ denied, 472 So.2d 919 (La. 1985). There, an employee of a pest control company was injured while servicing the defendant's apartment complex. The court found that the building owner was not entitled to immunity from tort liability, reasoning that "an apartment complex does not undertake to execute any work by the mere fact of a contractual obligation to arrange for or provide pest control."
Based on Duvalle, the test used to determine Southern Structures' status was: did that company have a contract to execute the erection services (to perform), or did it have a contract to arrange for those services (to provide)? The judge granted Southern Structures tort immunity based on the jury's finding that the contract was to perform. Mrs. Chauvin finds no fault with the use of the Duvalle test. She argues that the test would result in different answers depending on the time of inquiry, because at the time of the signing of the written contract Southern Structures intended to perform the services itself, but as of July 1, 1979 the nature of the contract changed because of Southern Structures' inability to perform those services. She concludes that Interrogatory # 2 was confusing and misleading to the jury, as it did not specify the point at which the determination was to be made. She asks for a reversal of the judgment on this ground.
The interpretations of LSA-R.S. 23:1032 and 1061 have resulted in a great deal of discussion and the development of numerous "tests" for statutory employment. The primary reason advanced for the difficulty is that Section 1061 has been interpreted in a context for which it was never intended. The original purpose for that section was to prevent an employer from evading his compensation liability through the use of an intermediary contractor. Most litigation under this section has involved its use as a defense to tort liability. See W. Malone & H. Johnson, Louisiana Workers' Compensation Law & Practice, Sec. 126 in 13 Louisiana Civil Law Treatise 250-262 (2d ed. 1980). As a result of this "shield," the principal has been elevated to a more preferred position than the injured employee's immediate employer, as the immunity is available regardless of whether the principal actually pays compensation.
*627 Recently, the Supreme Court reviewed the question of statutory employment, and noted a change in point of view on the subject. In Berry v. Holston Well Service, Inc., 488 So.2d 934 (La.1986), that court cited the cases of Benson v. Seagraves, 436 So.2d 525 (La.1983), Lewis v. Exxon Corp., 441 So.2d 192 (La.1983), and Rowe v. Northwestern Nat. Ins. Co., 471 So.2d 226 (La.1985) as evidence of a shift in "its interpretive analysis regarding the statutory employer defense from one which favored a liberal application of the doctrine to one which is more restrictive." 488 So.2d at 937.
Based on this observation, the Supreme Court sets forth its current method of analysis:
"Basically, a determination of whether a statutory employment relationship exists involves a three level analysis. In the first level, the primary focus is on the scope of the contract work. `The specific task to which an individual employee is put should not be determinative of his coverage under the Act. Instead, the entire scope of the work contract must be considered.' Lewis, supra, citing Malone, Principal's Liability for Workmen's Compensation to Employees of Contractors, 10 La.L.Rev. 25 (1949). The central question to be answered is whether the contract work is specialized or non-specialized. This of course is a question of fact, and courts should consider whether the contract work requires a degree of skill, training, experience, education and/or equipment not normally possessed by those outside the contract field. If it is determined that the contract work is specialized per se, as a matter of law the work is not a part of the principal's trade, business or occupation, and the principal is not the statutory employer of the specialized contractor's employees. In this situation, `the purpose behind the rule is not violated and the reason for holding the principal directly liable in compensation exclusively does not come into play' because the contractor is an independent business enterprise, rather than a mere intermediary interposed to avoid compensation responsibility. Williams v. Shell Oil Co., 677 F.2d 506 (5th Cir.1982) (Tate, J. writing for the panel), citing 13 W. Malone & H. Johnson, La. Civil Law TreatiseWorker's Compensation, Secs. 78, 126 (1980).
"If it is determined that the contract work is nonspecialty, then the inquiry shifts to a comparison of the principal's trade, business or occupation and the contract work to see if the latter can be considered a part of the principal's trade, business or occupation. The jurisprudence has forged several guidelines, in no way exhaustive, which can aid a court in resolving this factual issue:
(1) Is the contract work routine and customary? That is, is it regular and predictable? Nonrecurring or extraordinary constructions and repairs usually are outside the scope of the statute. On the other hand, general maintenance and repair work, which by their very nature allow the smooth and continued operation of the principal, are within the scope of coverage. Lewis, supra; Benson, supra; Barnes, supra; Reeves v. Louisiana & Arkansas Railway Co., 282 So.2d 503 (La.1973).
(2) Does the principal have the equipment and/or manpower capable of performing the contract work? This is a sub-species of the specialty inquiry, supra. Here the primary focus is on determining whether the contract work as relates to the principal is handled ordinarily through employees. Lewis, supra, citing 1C. A. Larson, The Law of Workmen's Compensation, Sec. 49.12, at 9-41 (1982).
(3) What is the practice in the industry relative to the contract work? Do industry participants normally contract out this type of work or do they have their own employees perform the work? See Reeves, supra; Brown v. Kaiser Aluminum and Chemical Corp., 289 So.2d 524 (La.App. 1st Cir.1973), writ not considered 293 So.2d 171 (La.1974); Malone & Johnson, supra, Sec. 126, pp. 252-53, fn. 91.
"These guidelines are not absolute or rigid, but are instead to be applied relatively, taking into consideration the size, *628 complexity, integration (either horizontal or vertical), or the lack thereof, etc. of the principal. What may be nonrecurring to a small concern, may for an industry giant be regular. Similarly while the type of contract work may be non-specialized (i.e. manual labor), for a small concern it may well be beyond the expertise or capability of its employees. 1 A. Larson, Workmen's Compensation for Occupational Injuries and Death, Sec. 49.13 (Desk ed. 1985). Basically, the factors developed by the jurisprudence strive to answer the overriding question of `whether [the contract work] is, in that business, normally carried on through employees rather than independent contractors.' Id. (emphasis added)
"Lastly, the court must determine if the principal is engaged in the work at the time of the alleged accident. La.R.S. 23:1032. At this level `[i]t is irrelevant that the principal has the financial resources or expertise to enter into a particular trade, business or occupation. In order for any person to come within the scope of the statute, he must be engaged in the enterprise at the time of the injury.' Lewis, supra." 488 So.2d at 937-39.
Applying the above analysis to the facts before us, we do not consider Southern Structures to have been the statutory employer of Lennis Chauvin. We view the relationship of the parties as of the time of the accident, regardless of any prior or subsequent involvement in erection operations. See Wilson v. A-1 Industries, Inc., 451 So.2d 1251 (La.App. 4th Cir.1984), writ denied, 457 So.2d 14 (La.1984).
It is our opinion that the work performed by Lennis Chauvin was specialized per se. The evidence shows that a special crew of workmen with particular skills is necessary to provide erection services. While some manufacturers may offer erection services, as Southern Structures did before July 1, 1979, they are not required to do so. When they do, they cannot utilize existing employees to perform this work, but must hire a separate group of individuals, train and equip them to do the job. The existence of independent firms which offer only erection services demonstrates the specialized nature of the work.
Even if Chauvin's work is considered non-specialized, it was not a part of Southern Structures' trade, business or occupation at the time of the accident. The company was entitled to limit the scope of its business. It manifested an intent to do just that by divesting itself of its erection division. This move was further evidence of the different functions of the manufacturing and erection operations. Even when Southern Structures did employ an erection crew, it was not unusual for the company to sell unassembled building components, leaving the customer to arrange for their assembly. At the time of the accident, Southern Structures did not perform erection services, and did not have the manpower to do that work. Thus, we do not feel that tort immunity is warranted in this case.
For these reasons, we reverse the judgment of the trial judge dismissing Southern Structures as the statutory employer of Lennis Chauvin.

MOTION IN LIMINE
Southern Structures filed a motion in limine to prevent the plaintiff from informing the jury that by finding that the contract between Southern Structures and Whipp was to perform, they would be finding that Southern Structures was Chauvin's statutory employer, which would render the company immune from tort. The trial court granted that motion. The plaintiff appeals. Since we have decided that Southern Structures was not Chauvin's statutory employer, and that the company may be held liable in tort, this issue needs no discussion.

DAMAGES
Mrs. Chauvin appeals as inadequate the general damage awards of $150,000 to her and $50,000 to her younger daughter. She cites several cases in which greater awards were made. On the other hand, the appellees cite cases in which lower awards were made. We do not feel that the *629 amounts awarded by the jury were so inadequate as to constitute an abuse of discretion. We affirm this portion of the jury's verdict.

CONCLUSION
The judgment dismissing Southern Structures and its insurer Liberty Mutual Insurance Company is reversed. The finding by the jury of liability on the part of C.E. Whipp, Gulf Water Systems, and Joseph Villy Touchet is also reversed. Southern Structures did not contest the finding of liability by the jury. Since we have reversed the jury's finding of liability on the part of Whipp, Gulf Water Systems and Touchet, Southern Structures alone is liable to the Chauvins. The awards of general damages to Mrs. Chauvin and her daughter Nichole are affirmed. The awards of $215,000 for loss of support and $25,000 for Lennis Chauvin's pain and suffering are also affirmed. Judgment is recast as follows:
It is hereby ordered, adjudged and decreed that there be judgment in favor of Jannery Lemaire Chauvin, individually, and against Southern Structures and Liberty Mutual Insurance Company, in solido, in the amount of $150,000;
It is further ordered, adjudged and decreed that there be judgment in favor of Jannery Lemaire Chauvin, as natural tutrix of her daughter, Nichole Simone Chauvin, and against Southern Structures and Liberty Mutual Insurance Company, in solido, in the amount of $50,000;
It is further ordered, adjudged and decreed that there be judgment in favor of Jannery Lemaire Chauvin, as natural tutrix of her daughter, Michelle Renee Chauvin, and against Southern Structures and Liberty Mutual Insurance Company, in solido, in the amount of $75,000;
It is further ordered, adjudged and decreed that there be judgment in favor of Jannery Lemaire Chauvin, individually and on behalf of her children, and against Southern Structures and Liberty Mutual Insurance Company, in solido, in the amount of $215,000 (loss of support);
It is further ordered, adjudged and decreed that there be judgment in favor of Jannery Lemaire Chauvin, individually and on behalf of her children, and against Southern Structures and Liberty Mutual Insurance Company, in solido, in the amount of $25,000 (survival actionpain and suffering sustained by Lennis Chauvin);
It is further ordered, adjudged and decreed that Southern Structures and Liberty Mutual Insurance Company, in solido, be cast for all costs of the trial court and of the appellate court.
REVERSED IN PART; AFFIRMED IN PART; JUDGMENT RENDERED.
LABORDE, J., concurs in the result.
NOTES
[1] There were two Joseph Touchets involved in this case: Joseph B. Touchet, referred to as J.B. Touchet, who was president of Gulf Water Systems; and Joseph V. Touchet, referred to as Villy Touchet, who was a carpenter hired by Whipp.