662 So.2d 788 (1995)
Roy Lee THOMAS, Insurance Company of North America & W.J. Penton Construction Co., Plaintiffs-Appellees,
v.
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, Defendant-Appellant.
No. 27203-CA.
Court of Appeal of Louisiana, Second Circuit.
October 12, 1995.
*790 Walker, Tooke, Perlman & Lyons by Jerald L. Perlman, Shreveport, for Appellant-State, DOTD.
Gregory J. Barro, Shreveport, for Appellee-Roy Lee Thomas.
Sam N. Gregorio, Shreveport, for Appellees-Ins. Co. of North America & W.J. Penton Co.
*791 Before SEXTON, NORRIS, LINDSAY and BROWN, JJ., and PRICE, J. Pro Tem.
BROWN, Judge.
Defendant, Department of Transportation and Development ("DOTD"), appeals a judgment that awarded damages to plaintiff, Roy Lee Thomas. We amend and affirm as amended.

FACTS
The Department of Transportation and Development contracted with Madden Contracting Company ("Madden") to resurface or overlay a stretch of State Highway 159 near Shongaloo, Louisiana. W.J. Penton Construction Company of Minden, Louisiana ("Penton") entered into a verbal contract with Madden to haul asphalt hot-mix, a mixture of hot tar and asphalt, to the repair project. Plaintiff, Roy Lee Thomas, was employed by Penton driving an 18-wheel tractor-trailer rig. Plaintiff hauled asphalt to the job site in an uncovered trailer, making as many as seven trips per day. Each load consisted of 25 to 28 tons of hot-mix. Each trip involved a distance of several miles and required plaintiff to pick up hot-mix at Madden's plant south of Minden, drive back through Minden and then up Highway 159 to the overlay project in north Claiborne Parish.
Plaintiff had been hauling to this job site for approximately two weeks before the accident occurred on March 14, 1991. The accident location was in a curve approximately nine miles north of Minden in Webster Parish on Highway 159 and approximately 12 to 14 miles from the overlay project. Plaintiff was aware, having traversed the roadway approximately 42 times in the preceding two weeks, of two very large potholes and a soft shoulder at that location. He usually avoided these obstacles by veering into the opposing lane. Around noon, on his third trip of the day, plaintiff approached the curve at or slightly in excess of the posted highway speed of 55 miles per hour. He downshifted as he approached the curve. This time, however, the opposing lane was occupied by on-coming traffic. Unable to veer left, plaintiff's truck struck one of the two adjacent potholes and was forced onto the highway's shoulder. The shoulder gave way and the truck rolled over, spilling its load. Plaintiff was covered in hot asphalt and sustained serious burns on his back, buttocks and right arm.
Plaintiff brought suit against DOTD claiming that the accident was caused by a defect in the road. Penton and Insurance Company of North America (Penton's workers' compensation insurer) intervened to recover sums paid to plaintiff as compensation benefits. DOTD moved for summary judgment claiming that it legally occupied the position of plaintiff's statutory employer and that plaintiff's recovery was limited to worker's compensation benefits. DOTD's motion was denied. Thereafter, the case proceeded to trial before a different judge. The trial judge, without addressing DOTD's assertion that it was plaintiff's statutory employer, found DOTD responsible for the maintenance and condition of Highway 159; that the roadway was defective and unreasonably dangerous; and apportioned liability between DOTD and plaintiff as 80% and 20% respectively. The judge then awarded damages as follows:

General Damages/Pain and Suffering $ 750,000
Medical ExpensesPast and Future $ 150,000
Past Lost Wages $ 20,000
Lost Future Income $ 400,000
 __________
 Total $1,320,000

DOTD asserts error in the trial court's refusal to recognize it as plaintiff's statutory employer. In the alternative, DOTD argues that the percentage of fault assigned the parties is improper and that the general damage and lost future income awards were excessive.

DISCUSSION

Statutory Employer Defense
Defendant first argues that it is immune from tort liability under the provisions of LSA-R.S. 23:1032 and 1061. The Workers' Compensation Act represents a compromise where the employer is responsible to pay limited benefits regardless of fault and the employee loses his right to fully recover in tort. To effectuate the surrender of these valuable rights by both the employer *792 and employee, recovery is exclusively limited to benefits under the Workers' Compensation Act and the employer has immunity from tort actions. W. Malone & A. Johnson, Workers' Compensation Law and Practice § 361, in 14 Louisiana Civil Law Treatise (3d ed. 1994).
Plaintiffs filed this tort action based upon fault. Thus, if DOTD is considered plaintiff's employer, its' responsibility is limited to compensation benefits and it is immune from tort liability. This would be true even though all compensation benefits were paid by Penton.
A principal who contracts with another to perform work that is part of the principal's "trade, business, or occupation," is liable to pay workers' compensation benefits to any employee of the contractor who is injured while performing such work. LSA-R.S. 23:1061. In such instances, the principal is commonly referred to as a statutory employer. Because of the exclusiveness of the compensation remedy, statutory employers have also been afforded immunity from tort liability for work-related injuries suffered by the employees of their various contractors even though these statutory employers never actually pay any worker's compensation benefits. LSA-R.S. 23:1032.
In its brief, DOTD argues two premises supporting its claim for statutory employer status. First, DOTD argues that it, as principal, entered into a contract with Madden, a third party, for the overlay project. Madden then entered into a contract with a subcontractor, Penton, for the performance of part of the work. Defendant argues that these facts satisfy the requirements of the "two contract" theory for identifying statutory employment relationships.
This court recently explained the "two contract" theory in Freeman v. Moss Well Service, Inc., 614 So.2d 784 (La.App. 2d Cir.1993):
Thus, in response to a tort action, Section 1061 encompasses two alternative threshold bases for the statutory employer defense: (1) contracting by a principal with another for the execution of work which is part of the principal's trade, business, or occupation; or (2) contracting by a principal with another to perform all or any part of the work which the principal is contractually obligated to perform. The latter situation ... is commonly referred to as the "two contract" defense.
The "two contract" statutory employment defense thus contemplates relationships among at least three entities: a general contractor who had been hired by a third party to perform a specific task; a subcontractor hired by that general contractor; and an employee of the subcontractor.
Moss Well Service, Inc., 614 So.2d at 786. The purpose behind the "two contract" theory is to establish a compensation obligation on the part of a principal who contractually obligates itself to a third party for the performance of work and who then subcontracts with intermediaries whose employees perform all or any part of the work. In return for its compensation obligation, such a principal is then insulated from tort liability.
In light of the relationship among the parties, DOTD's reliance on the "two contract" statutory employment defense is misplaced. DOTD does not occupy the position of a principal contractually obligated to a third party to perform a specific task. Rather, DOTD occupies the position of the third party hiring a general contractor, Madden. The relationship among the parties under the facts of this case precludes an application of the "two contract" theory to support a statutory employer defense.
In the alternative, DOTD argues that the overlay project lies squarely within DOTD's "trade, business, or occupation." DOTD claims that the transportation of hot asphalt was "integrally related" to its trade, business, or occupation. Thus, DOTD claims to be plaintiff's statutory employer and therefore potentially liable for workers' compensation payments while enjoying immunity from tort liability.
We recently addressed the "trade, business, or occupation" statutory employer defense in Kirkland v. Riverwood International USA, Inc., 26,741 (La.App. 2d Cir. 06/21/95), 658 So.2d 715. Therein, we discussed the conclusory nature and predictable outcome typically produced by the so-called *793 "integral relation" test formulated in Thibodaux v. Sun Oil Co., 218 La. 453, 49 So.2d 852 (1950). We noted recent amendments to LSA-R.S. 23:1032 and 1061, which abolished the rigid, three-tiered test announced in Berry v. Holston Well Service, Inc., 488 So.2d 934 (La.1986), and the absence of a clear test for identifying a statutory employment relationship when assessing a party's trade, business or occupation. Finally, we noted recent cases where the integral relation test was seemingly abandoned by our supreme court. We concluded that the proper identification of statutory employment required a consideration of the "totality of the circumstances":
A "totality of the circumstances" approach involves consideration on a case-by-case basis of the various factors discussed by pre-Berry courts. No single factor is determinative and the presence of one factor may compensate for the lack of another. Among the factors to be considered in making a trade, business or occupation determination are:
(1) Was the work specialized or non-specialized?

Teague v. Sawyer Drilling Company, 499 So.2d 127 (La.App. 2d Cir.1986); Chauvin v. Gulf Coast Minerals Inc., 509 So.2d 622 (La.App. 3d Cir.1987), writ denied 512 So.2d 1175 (La.1987); Cantrell v. BASF Wyandotte, 506 So.2d 793 (La.App. 1st Cir. 1987), writ denied, 512 So.2d 1178 (La. 1987); Roberts v. Amstar Corporation, 496 So.2d 1146 (La.App. 4th Cir.1986); Palmer v. Loyola University, 496 So.2d 421 (La. App. 4th Cir.1986), writ denied 501 So.2d 207 (La.1987).
(2) Was the contract work routine, customary, ordinary or unusual?

Rowe v. Northwestern National Insurance Co., [471 So.2d 226 (La.1985)] supra; Berry v. Brown & Root, Inc., 595 So.2d 767 (La.App. 4th Cir.1992); Poirrier v. Cajun Insulation Inc., 459 So.2d 737 (La.App. 4th Cir.1984); Butler v. Home Insurance Co., [448 So.2d 801 (La.App. 2d Cir.1984)] supra.

(3) Does the defendant customarily have his own employees perform the work?

Lewis v. Exxon Corporation, 441 So.2d 192 (La.1983), on remand, 451 So.2d 24 (La. App. 1st Cir.1984); Teague v. Sawyer Drilling Co., supra.

(4) Does the defendant have the equipment and personnel capable of performing the contract work?

Lewis v. Exxon Corporation, supra; Teague v. Sawyer Drilling Co., supra; Berry v. Brown & Root, Inc., supra; Stine v. Creel, 417 So.2d 1243 (La.App. 1st Cir.1982), writ denied, 422 So.2d 163 (La.1982).
(5) What is the practice in the industry? Do industry participants normally contract out this type of work, or do they have their own employees perform the work?

Rowe v. Northwestern National Insurance Co., supra; Barnes v. Sun Oil Company, 362 So.2d 761 (La.1978); Berry v. Brown & Root, Inc., supra; Bonstill v. Goldsberry Operating Co., 478 So.2d 729 (La.App. 3d Cir.1985); Calais v. Exxon Pipeline Co., 430 So.2d 321 (La.App. 3d Cir.1983).
(6) Was the defendant engaged in the contract work at the time of the incident?

Rowe v. Northwestern National Insurance Co., supra; Lewis v. Exxon Corporation, supra; Roberts v. Amstar Corporation, supra; Palmer v. Loyola University, supra.

Kirkland v. Riverwood International USA, Inc., 26,741 (La.App. 2d Cir. 06/21/95), 658 So.2d 715, 720-21.
The limited testimony adduced at trial concerning the relationship between the parties provided insight only into the contractual bases of their agreement. The record showed that plaintiff was employed by Penton to transport asphalt hot-mix to a DOTD project for Madden; that plaintiff was injured while hauling asphalt to this DOTD project; that the accident occurred on a heavily used public highway that was not a part of this particular overlay project; that DOTD was responsible to the general public for maintaining this highway; that the highway at the accident site was defective; and that the defect presented a risk to all travelers. No other evidence relevant to the statutory employment inquiry was offered.
*794 In Stelly v. Overhead Door Company of Baton Rouge, 94-0569 (La. 12/08/94), 646 So.2d 905, the supreme court recounted the basic principles for interpreting the coverage and immunity provisions of the workers' compensation act:
In light of this basic history and policy, we agree with the foregoing authorities that every presumption should be on the side of preserving the general tort or delictual rights of an injured worker against the actual wrongdoer, in the absence of explicitly statutory language limiting or excluding such rights. (emphasis theirs).
Stelly, supra, citing Roberts v. Sewerage & Water Board of New Orleans, 92-2048 (La. 03/21/94), 634 So.2d 341, 346.
In other words, Stelly mandates a liberal construction of the coverage provisions of the act, coupled with a narrow construction of its immunity provisions. Id.
In a tort suit against the principal by an injured employee of a contractor, the principal bears the burden of proving statutory employment under R.S. 23:1061. Dupre v. Exxon Pipeline Co., 638 So.2d 1118 (La. App. 3d Cir.1994), writ denied, 646 So.2d 379 (La.1994); Freeman v. Chevron Oil Co., 517 F.2d 201 (5th Cir.1975). On the record presented, we cannot conclude that the trial court erred in refusing to recognize DOTD as plaintiff's statutory employer.

Comparative Fault
DOTD has chosen not to challenge the trial court's conclusion regarding liability. Instead, defendant challenges the trial court's apportionment of only 20% fault to plaintiff and the remainder to DOTD. On appeal, DOTD argues that plaintiff's negligence was such that he should bear a minimum of 50% fault. The allocation of fault is a factual determination that should not be disturbed on appeal absent a finding that the trial court was clearly wrong or manifestly erroneous. Socorro v. City of New Orleans, 579 So.2d 931 (La.1991); Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985). Our review leads us to conclude that the trial court's determination was reasonably based on fact and is neither manifestly erroneous nor clearly wrong.
Louisiana State Trooper Richard Porter investigated the scene of plaintiff's accident. Trooper Porter measured the potholes as each being approximately two feet in diameter and two and one-half inches deep. A build-up of loose asphalt on the leading edge of the potholes was approximately two inches high. This had the effect of creating a depression with a total depth of four and one-half inches. Furthermore, Trooper Porter testified that the roadway material had eroded completely away with the bottom of the potholes reaching into the dirt beneath the road. The northbound lane traveled by plaintiff was only ten feet wide. The two potholes, lying side by side and each being two feet wide, thus occupied approximately forty percent of the northbound lane. Trooper Porter also noted that the road's shoulder was in disrepair and unable to support the truck's weight.
Aldrick Penton testified that the potholes existed from the inception of Penton's hauling operation. Mr. Penton stated that his drivers were warned that they might have to veer into the opposing lane or travel onto the road's shoulder to avoid the road hazard. Mr. Penton also testified that he saw DOTD employees, in clearly marked orange vehicles, pass the potholes on several occasions as he traveled to and from the highway repair job site.
Gerald Shaffer, DOTD's state highway maintenance supervisor for Webster Parish, testified that all state highways are cruised for defects every two weeks. During the two weeks preceding the accident, the relevant portion of Highway 159 may have been cruised as many as four times. Nonetheless, the potholes in question were either not identified or simply went unrepaired.
Dr. Olin Dart, plaintiff's highway and accident reconstruction expert, testified that the potholes represented a defect that created an unreasonable risk for the average motorist. Dr. Dart testified that the appearance of the potholes suggested that they had developed over time. Because of their size and the hazard they posed, the potholes should have been immediately repaired according to *795 DOTD's own written guidelines. Both Dr. Dart and Dr. Richard Robertson, defendant's accident reconstruction expert, testified that the accident resulted from a combination of the potholes and plaintiff's speed. Dr. Dart estimated plaintiff's speed at 55 to 60 miles per hour. According to his tests, Dr. Dart concluded that the curve could have been successfully negotiated at such a speed in the absence of potholes. Dr. Robertson, who estimated plaintiff's speed at 57 to 66 miles per hour, stated that the accident would have occurred even without the potholes. The experts also disagreed over the relevance of a newly posted advisory speed limit sign recommending a speed of 35 miles per hour when entering the curve where the accident occurred. While Dr. Robertson suggested that plaintiff should have obeyed the speed warning, Dr. Dart noted that such a warning is merely a recommended speed for inclement weather. The accident occurred on a dry, sunny, spring afternoon. Despite their differences of opinion, both experts agreed that it was imprudent for plaintiff to approach a known road hazard and fail to reduce his speed during his approach.
The court heard testimony from plaintiff who stated that he was traveling between 55 and 57 miles per hour and downshifted when he approached the curve. Plaintiff also made it clear that he was thoroughly familiar with the potholes, having made over forty deliveries of asphalt during the two weeks preceding the accident. Plaintiff, however, had never actually hit the potholes.
The road hazard encountered by plaintiff occupied almost half of the available roadway and posed a threat to the entire motoring public. Evidence presented at trial indicated that the potholes existed for an extended period of time and should have been identified during DOTD's regular and ongoing patrol for road hazards. The sheer size of the potholes suggests that they posed a significant danger that should have been repaired immediately. Expert testimony indicated that DOTD's written guidelines mandated prompt repair for roadway defects similar to those in question. Furthermore, testimony indicated that the roadway's soft shoulder probably caused plaintiff's truck to roll over. The roadway was grossly defective and DOTD failed to identify and timely repair an obvious hazard.
Plaintiff, however, is not without fault. His previous ability to avoid the potholes was contingent on the highly dangerous maneuver of entering the lane of opposing traffic. While this approach worked on numerous occasions, plaintiff's behavior simply was not reasonable in light of the danger posed to other motorists and the hazardous nature of the substance plaintiff transported.
Nonetheless, our review of the entire record leads us to conclude that the evidence presented to the trial judge, along with his credibility determinations with respect to conflicting expert testimony, supports the conclusion that the grossly defective roadway and DOTD's failure to make timely repairs were the primary causes of plaintiff's accident. We cannot conclude that the allocation of fault was an abuse of the trial court's discretion.

General Damages
DOTD argues that the general damage award of $750,000 is excessive. In reviewing a general damage award, the initial inquiry is whether the award for the particular injuries and their effects to the injured person is an abuse of the "much discretion" of the trier of fact. Only after such an abuse of discretion is noted will a resort to prior awards be appropriate and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993).
Plaintiff was severely burned over 25% of his body. Three quarters of the affected area received third degree burns while the remainder were deep second degree burns. Plaintiff's right arm was covered in third degree burns from his armpit to his wrist. The right arm was covered with skin grafts harvested from plaintiff's thighs. The skin harvesting process itself produced injuries not unlike second degree burns, thereby further intensifying plaintiff's suffering.
Plaintiff suffered through two agonizing debridement treatments per day for two to *796 three weeks and began a rigorous physical therapy program. Although plaintiff did not complete the physical therapy treatments, the attending physician stated that the program was extremely painful and that many patients prefer additional surgery over physical therapy. The physician testified that plaintiff's improvement was a testimony to what physical therapy he was able to endure.
Plaintiff has suffered permanent scarring that is unsightly and a cause for embarrassment. Indeed, plaintiff testified concerning the anguish he felt when strangers stared at his scars or when children called him a monster. Plaintiff suffers from recurring flashbacks, nightmares, and an inability to sleep. A pre-existing stomach ulcer condition has been exacerbated by the intense stress to plaintiff's body caused by the burn injuries.
Plaintiff's injuries were extremely painful and resulted in extensive scarring and disfigurement. No monetary figure can truly compensate plaintiff for the negative effect his injuries have had and will continue to have for the rest of his life. We find no abuse of discretion in a general damage award of $750,000. We therefore need not address the competing quantum studies briefed by the parties.

Loss of Future Earnings
This court succinctly discussed the considerations involved in awarding sums for lost future earnings in Keeth v. Dept. Of Public Safety & Transp., 618 So.2d 1154 (La.App.2d Cir.1993):
Awards for lost future income are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty. Thus, the courts must exercise sound judicial discretion in determining these awards and render awards which are consistent with the record and which work an injustice on neither party.
The factors to be considered in determining loss of future income include the plaintiff's physical condition before and after his injury; his past work record and the consistency thereof; the amount the plaintiff probably would have earned absent the injury complained of; and the probability that he would have continued to earn wages over the balance of his working life. A loss of future income award is not predicated upon the difference between the plaintiff's earnings before and after a disabling injury. Such an award is predicated, more strictly considered, upon the difference between the plaintiff's earning capacity before and after a disabling injury.
In computing loss of future income, it is first necessary to determine whether and for how long a plaintiff's disability will prevent him from engaging in work of the same or similar kind that he was doing at the time of his injury. It is also necessary to ascertain whether he has been disabled from work for which he is fitted by training and experience.
Keeth v. Dept. Of Public Safety & Transp., 618 So.2d at 1162 (Citations omitted).
The trial court did not err when it concluded that plaintiff has suffered some measure of permanent disability. Dr. Richard Galloway, a vocational rehabilitation expert, testified concerning plaintiff's ability to return to work. Plaintiff is a single black male in his early thirties with a ninth grade education. His reading ability is the equivalent of a child in third grade while his math skills approximate those of a child in fourth grade. Plaintiff's functional illiteracy essentially relegated him to a lifetime of manual labor. Dr. Galloway stated that plaintiff's main asset was his strong body. Plaintiff's physical injuries, however, have robbed him of significant strength and mobility while creating environmental limitations that preclude strenuous outdoor labor.
The work for which plaintiff was trained and experienced was limited to truck driving. Dr. Galloway stated that plaintiff could not safely return to driving a large truck like the one he drove for Penton. Instead, plaintiff would be limited to driving smaller, delivery-type vehicles with a further limitation that the vehicle have an air conditioned cab. Dr. Galloway concluded that plaintiff's disabilities have greatly restricted his already limited employment opportunities. Plaintiff has suffered some degree of permanent disability and is entitled to an award of lost future *797 earnings adjusted for the limited employment plaintiff can now hope to find.
The trial court relied on the testimony of Dr. Luvonia Casperson in determining the amount of lost future earnings. Dr. Casperson prepared figures for various scenarios based upon plaintiff's projected retirement age, an offset for anticipated income from plaintiff's return to limited employment and various estimates for plaintiffs earning capacity. The earning capacity estimates utilized three different bases for plaintiff's expected future wages. The first basis was an annualized estimate of plaintiff's wages at the time of the accident, or approximately $10,000. The second basis was the median annual wage of all black males in the United States with an education limited to completing some level of high school, or $14,736. The final basis was the average annual wage for truck drivers in the United States, estimated at $20,853. Dr. Casperson opined that the average wage for truck drivers was the best estimate of plaintiff's future earning capacity and performed her present value and inflation calculations on this basis. Assuming that plaintiff's useful work life expectancy would force him retire at age 56.2 and assuming further that he would be employed in a limited capacity up to that time, Dr. Casperson concluded that $404,885 was the proper award for plaintiff's lost future wages.
Under cross examination, it became clear that Dr. Casperson gave little weight to plaintiff's sporadic work history. Plaintiff had been employed as a plastics factory worker, a horse groomer, a garbage collector and a garbage truck driver. In most instances, plaintiff worked for less than one year before voluntarily terminating his employment. Dr. Casperson also discounted plaintiff's conviction for marijuana usage and was apparently unaware that plaintiff had been convicted for burglary. Instead, Dr. Casperson based her projections on the conclusion that plaintiff was "a relatively young man who took a while to grow up." Dr. Casperson considered plaintiff's employment history only as far back as the six months preceding the accident.
Plaintiff's background and employment record reflect an instability that leads us to question the propriety of using a nation-wide average wage for truck drivers to calculate future lost earnings. We feel that plaintiff had already demonstrated his full earning potential. Under the circumstances, the best measure of plaintiff's earning capacity is found in his earnings at the time of the accident. Dr. Casperson's calculations on this basis, including an offset for sums actually earned through employment, yielded figures of $199,861 with retirement at age 56.2, or $263,448 with retirement at age 65. We find nothing in the record to prove that plaintiff could not work, in some limited capacity, to the age of 65. The trial court erred in its reliance on figures from an unrealistic earnings base and on an unproven need for a premature retirement. We therefore conclude that the appropriate award for lost future earnings is $263,448.

CONCLUSION
We find no error in the trial court's refusal to recognize defendant as plaintiff's statutory employer. Neither do we find error in the allocation of fault or the award of general damages. We amend the award of future lost wages to predicate it upon a more realistic basis for plaintiff's future earning capacity. In all other respects the trial court decision is affirmed. Costs are assigned to defendant.
AMENDED AND AFFIRMED AS AMENDED.
PRICE, J. Pro Tem., concurs.
LINDSAY, J., dissents and assigns reasons.
SEXTON, J., dissents for the reasons assigned by LINDSAY, J.
LINDSAY, Judge, dissenting.
I dissent from the majority's decision concerning the statutory employer defense. I would apply the "integral relation" test set forth in Moore v. Crystal Oil Company, 626 So.2d 792 (La.App.2d Cir.1993), writ granted and reversed on other grounds, 93-3103 (La. 2/25/94), 632 So.2d 758, rehearing denied, 93-3103 (La. 3/25/94), 635 So.2d 229. Under such a test, the evidence clearly shows that *798 the DOTD was the plaintiff's statutory employer and was, therefore, immune from tort liability.