MOORE, J.
AIX Energy Inc. and its insurer, St. Paul Fire & Marine Insurance Company, appeal a jury verdict that awarded the plaintiffs, Jeremy Shephard and Michael Jackson, a total of $22.45 million for burns and other losses sustained in a natural gas fire that occurred on an oil well where they were working. AIX and St. Paul also contest several of the district court's pretrial and posttrial rulings. We affirm in part, but amend the judgment to make certain elements of the damage award conform to the trial evidence and to limit St. Paul's postjudgment interest to the final amount of the judgment, and render.
FACTUAL BACKGROUND
AIX was an owner/operator of the Bud Meadors No. 3 well, in Claiborne Parish. AIX spudded the well in January 2013 and ran it down through the Haynesville Shale and into the Smackover formation, over 10,000 feet deep. AIX cased the well and perforated it in the Smackover, but it did not produce at a commercial rate. In this time frame, AIX used drilling mud solutions that weighed between 9.9 and 10.3 pounds per gallon ("PPG") to maintain equal pressure between the well bore and the surrounding formation.
In late June AIX performed a frac job and hired a contractor, Republic Well Testing, to measure the flowback; at this time, Republic installed a closed flowback tank some 50 feet from the well. The frac job did not help production, so AIX decided to do a workover on the well. It hired Baker-Hughes Inc. to set a "packer" and try to produce through smaller tubing; Dykes Well Service to provide a workover rig and crew; State Line Vacuum to supply the standard (2% KCL) completion fluid; and Avery Graves (who was under contract to Bear Creek Services) as a completion consultant. The plaintiffs, Jackson and Shephard, worked for Dykes, as toolpusher and floor hand, respectively.
*202 Dykes's crew arrived on June 27, and installed a flowback tank and pump about 6-8 feet from the well. Baker Hughes had to shut in the well that afternoon, finding sand in the production casing; however, slow production continued overnight, running into Republic's flowback tank.
The next day, June 28, Baker Hughes could not get the packer down to the desired depth because of sand; AIX directed Graves, the consultant, to run a "cleanout operation." Late that morning, the well was shut in again, and Republic disconnected its flowback tank (some 50 feet away), and Dykes connected its own tank (6-8 feet away). At AIX's direction, State Line delivered the 2% KCL completion fluid and pumped 60 barrels of this into the well from its flowback tank.
The Dykes crew then ran a bit and length of narrow tubing down the well in an effort to circulate the sand out of the casing. Gas bubbles started to rise to the surface, so Jackson (Dykes's toolpusher) shut in the well again. Graves (the completion consultant) directed Jackson to "circulate" the gas out of the well; the Dykes crew used its own flowback tank, instead of the Republic tank that was farther away. This went on for 30-45 minutes, when, suddenly, there was an explosion.
Shephard and Jackson, who were standing nearest the well, were knocked over by a wall of flame and seriously burned. Shephard described it as a huge eruption of gas from the completion fluid; Jackson said it "hit and blew with no warning."
Shephard was airlifted to the LSU burn center, in Shreveport, where he stayed one month; he was then transferred to Life Care. He had second-degree burns over 33-49% of his body, including his face, neck, flank, shoulders, forearms and legs; he has had four surgeries, including facial reconstruction to give him a "new lip," but he is afraid he will lose his ears. He has also complained of chronic pain, low back pain, traumatic brain injury, and seizures. Jackson sustained burns to 20% of his body, with second-degree burns to his face, head, ears and arms; he has also complained of pulmonary collapse and hearing loss.
PROCEDURAL HISTORY
Shephard, Jackson and their wives filed this personal injury action in June 2014 in Caddo Parish. Defendants included AIX Energy Inc., AIX Operating Co., Bear Creek, National Union (Bear Creek's insurer), Graves, and Republic Well Testing. A multiplicity of responsive pleadings followed. Germane to this appeal, in March 2015 the plaintiffs added St. Paul, AIX's liability carrier. The plaintiffs ultimately settled with Bear Creek and Graves, in his individual capacity, reserving their rights against National Union (Bear Creek's insurer), subject to a credit of $832,611.
In October 2015, AIX Energy and AIX Operating Co. filed for bankruptcy protection. Pursuant to an agreement, the bankruptcy court lifted the stay to allow Shephard and Jackson to proceed against AIX's liability insurance policies and proceeds, with the proviso that they would file no claim against the bankrupt's estate.
Among many other pretrial motions filed by the parties, AIX filed a Daubert motion to exclude the plaintiffs' expert, William D. Griffin, a chemical engineer, from testifying in the field of petroleum engineering. After an extensive hearing in early December 2016, the district court denied the defense motion and allowed Griffin to testify as tendered.
OVERVIEW OF TRIAL TESTIMONY
The matter came to trial over nine days, December 5-15, 2016, against the remaining defendants, AIX Energy (subject to *203 the bankruptcy court ruling), Graves (the completion consultant), Bear Creek (for any actions independent of Graves's), Republic Well Testing, State Line Vacuum and Dykes Oil Co. Presentation of the evidence was tedious and technical, focusing on the mechanics of a workover operation, the conduct of all the persons at the Bud Meadors No. 3 site on the day of the accident, the course of treatment each plaintiff received, medical opinions as to their injuries and economists' opinion as to their projected losses.
On the critical question of how the accident occurred, the plaintiffs' expert, Griffin, felt that the completion fluid ordered by AIX to circulate the well, 2% KCL, which weighs 8.4 PPG (only slightly heavier than pure water), was simply too light to keep down the gas bubbles entering the well at Smackover depth. He calculated, using data from the frac, that the fluid should have weighed about 10.5 PPG, and this would have controlled the escaping gas. He also faulted AIX for not writing a "completion plan" and giving it to all parties on the site.
AIX's expert, David Watson, disagreed, testifying that 8.4 PPG is standard for completion fluid and for circulating a well during workover. In Watson's view, Griffin was hopelessly wrong to recommend an extremely heavy "drilling mud" during the completion process. Watson felt that the amount of gas that escaped on June 28 was modest and normal, and that the plaintiffs were at fault for not noticing the normal accumulation around the wellhead, for using a flowback tank and pump much too close to the well, and for failing to shut in the well. Watson also thought that other persons around the well site were at fault for causing, or failing to prevent, sparks.
After the plaintiffs rested, AIX moved to amend the jury instructions from referring to "a cause" to "proximate cause." The court did not explicitly rule on this; the instructions ultimately stated, "The burden of proving both the existence of the injuries and the causal connection between them and the accident rests with the Plaintiff."
After 2 hours and 40 minutes' deliberation, the jury returned a verdict that accepted Griffin's analysis of the accident, and rejected Watson's. It found AIX was negligent, and its negligence was "a cause" of the plaintiffs' injuries; Graves and Bear Creek were also negligent, and "a cause" of the plaintiff's injuries; Republic Well Testing, State Line Vacuum, Dykes Oil Co., and the plaintiffs themselves, were not negligent. The jury allocated fault 97.5% to AIX, 0.5% to Graves and 2% to Bear Creek. It awarded damages as follows:
*204 Jeremy Shephard Past & future physical pain & suffering, mental anguish, loss of enjoyment of life $ 7,500,000.00 Past medical expenses 235,438.03 Future medical expenses 7,500,000.00 Past lost wages 245,000.00 Future lost wages 2,000,000.00 Emily Shephard Loss of consortium 500,000.00 Michael Jackson[1] Past & future physical pain & suffering, mental anguish, loss of enjoyment of life 3,000,000.00 Past medical expenses 45,747.16 Future medical expenses 1,000,000.00 Loss of future earning capacity 1,500,000.00
[Editor's Note: The preceding image contains the reference for footnote[1] ].
AIX filed several posttrial motions. One was an exception of no right of action or, alternatively, motion to reopen or supplement the record, asserting that the plaintiffs were AIX's statutory employees under the two-contract theory, La. R.S. 23:1601 A(2). Another was a motion to nullify the verdict on grounds that one juror, Halie Moore, did not live in Caddo Parish at the time of her service on the jury. The third was a motion for new trial or JNOV asserting, among other things, that the damages were not based on, or consistent with, the trial evidence. The court denied all motions, noting, however, that the damages were "extremely high."
The court rendered judgment in favor of Shephard and against AIX, "pursuant to the ruling" of the bankruptcy court, for the full total (less the 2.5% fault ascribed to Graves and Bear Creek), or $17,043.427, "limited to" AIX's insurance proceeds, and against St. Paul for $8,146,995 (stated as 74.3% of the policy limit available), plus prejudgment interest on the reduced amount ($8.1+ million) and postjudgment interest on the full ($17+ million); and in favor of Jackson, also "pursuant to the ruling" of the bankruptcy court, for the full total (less the 2.5%), $5,407,103, and against St. Paul for $2,584,450 (stated as 23.7% of the policy limit available), plus prejudgment interest on the reduced ($2.58+ million) and postjudgment interest on the full ($5.4+ million) amount.[2]
AIX has appealed, raising eight assignments of error.
DISCUSSION
Assignment 1: Jury Instructions
By its first assignment of error, AIX urges the court erred in failing, over AIX's objection, to properly instruct the jury as to proximate cause, a critical issue in this fact-intensive case, given the "obvious" fault of AIX's independent contractors and their employees. AIX urges that the charge ultimately used failed to clarify that in the absence of a showing of operational control, the scope of AIX's duty did not extend to risks created by AIX's independent *205 contractors and their employees. AIX cites the "scope of protection" concept, Robert v. Benoit , 605 So.2d 1032 (La. 1991), and argues that an erroneous jury instruction requires a de novo review of the record, Nicholas v. Allstate Ins. Co. , 99-2522 (La. 8/31/00), 765 So.2d 1017.
Adequate jury instructions are those which fairly and reasonably point out the issues and provide correct principles of law for the jury to apply to those issues. The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; the judge must, however, correctly charge the jury. If the trial court omits an applicable, essential legal principle, its instruction does not adequately set forth the issues to be decided by the jury and may constitute reversible error. Adams v. Rhodia Inc. , 2007-2110 (La. 5/21/08), 983 So.2d 798. A reviewing court must exercise great restraint before it reverses a jury verdict due to an erroneous jury instruction. Wooley v. Lucksinger , 2009-0571 (La. 4/1/11), 61 So.3d 507. A party's failure to object to jury instructions before the jury retires or immediately thereafter constitutes a waiver of the objection. Carter v. City of Shreveport , 51,589 (La. App. 2 Cir. 9/27/17), 244 So.3d 659, 2017 WL 4273452, and citations therein.
In a conference on the eighth day of trial, AIX's cocounsel told the court, "We need to talk about this operation and control," and lead counsel asked, "Do we need to define operational control then once you bring that term into the charge?" Lead counsel then stated, "Let's think about that one, Judge, over lunch. Because once you do that, then you got to put all that other stuff in." After the lunch break, however, no one ever again mentioned operational control or objected. On this record, we find any complaint about the failure to include operational control in the jury instructions was waived. Carter v. City of Shreveport , supra ; Kose v. Cablevision of Shreveport , 32,855 (La. App. 2 Cir. 4/5/00), 755 So.2d 1039, writs denied , 2000-1177 (La. 6/16/00), 764 So.2d 964, 2000-1289 (La. 6/16/00), 765 So.2d 340.
Immediately after the lunch break, counsel stated that he had received instructions from his client "that instead of just having 'a' cause, we need to put proximate cause." Plaintiffs' counsel objected, "That is confusing for the jury," and AIX's counsel replied, "You're probably right, but, you know, you can keep it like it is and just note my objection, and we'll move on." In short, AIX preserved the objection to the failure to include "proximate cause" in the jury instruction.
As noted, the instructions ultimately given to the jury stated, "The burden of proving both the existence of the injuries and the causal connection between them and the accident rests with the Plaintiff." There is no reference either to "a cause" or to "proximate cause." The instructions do not precisely track the formulation of the elements of a negligence cause of action of Pitre v. Opelousas General Hosp. , 530 So.2d 1151 (La. 1988), and suggested by Prof. Alston Johnson in 18 La. Civ. L. Treatise, Civil Jury Instructions, § 3:17 (Thomson Reuters ©2011) : "Did the defendant's negligence in fact cause damage to the plaintiff?" However, the Supreme Court has often stated that three elements are necessary for a negligence cause of action: fault, causation and damages. Eagle Pipe & Supply Inc. v. Amerada Hess Corp. , 2010-2267 (La. 10/25/11), 79 So.3d 246, 174 Oil & Gas Rep. 32 ; M.J. Farms Ltd. v. Exxon Mobil Corp. , 2007-2371 (La. 7/1/08), 998 So.2d 16, 177 Oil & Gas Rep. 249. The trial court's decision to use "causal connection" instead of "cause" or "proximate cause" does not strike us as *206 a serious deviation from the core concepts of a negligence cause of action. This court and others have recognized that jury instructions (or interrogatories) about "proximate cause" or "legal cause" can be inherently confusing. Maxwell v. Soileau , 561 So.2d 1378 (La. App. 2 Cir. 1990), writs denied , 567 So.2d 1123, 1124; Wiltz v. Brothers Petroleum LLC , 13-332 (La. App. 5 Cir. 4/23/14), 140 So.3d 758, writs denied , 2014-1252, -1298 (La. 10/10/14), 151 So.3d 581, 583. Moreover, the jury verdict form carefully asked about the negligence and causation of each remaining defendant-AIX, Graves, Bear Creek, Republic Well Testing, State Line Vacuum, Dykes Oil Co., and both plaintiffs. Given the totality of the instructions and the verdict form, we consider it unlikely that the jury was misled into disregarding the other parties' negligence, or into thinking that AIX's conduct overrode that of everyone else on the well site.
This assignment of error lacks merit, and does not provide a basis for applying a de novo review of the jury's factual findings.
Assignment 2: Finding and Allocation of Fault
By its second assignment of error, AIX urges the jury erred in assigning 97.5% fault to AIX, 2% to Bear Creek, 0.5% to Graves, and 0% to Dykes, Jackson, Shephard and State Line. The argument is fact-intensive and retraces the drilling history of the Bud Meadors No. 3. AIX contends that Dykes was at fault for allowing gas to accumulate at the well site for 30-45 minutes (a situation that State Line's driver described as "gassy") and for using its own flowback tank and pump, which were too close to the well; Jackson was at fault for not following usual safety protocols, particularly for failing to move the pump at least 50 feet from the gas source; Graves was at fault for approving the placement of the pump and tank, although he was correct in saying that 2% KCL is "pretty standard" as completion fluid. Mostly, however, AIX contends it was not at fault, because the plaintiffs' theories about how the accident happened are simply flawed: the notion that 2% KCL was improper is "scientifically erroneous," it is not standard practice for the operator to write a completion plan, "cleanout" is a basic, routine and safe operation, and the plaintiffs lodged ad hominem attacks on AIX's operations manager, Andrew Imel.
In all civil cases, the appropriate standard for appellate review of factual determinations is the manifest error-clearly wrong standard, which precludes the setting aside of a trial court's finding of fact unless that finding of fact is clearly wrong in light of the record reviewed in its entirety. Hayes Fund for First United Methodist Church v. Kerr-McGee Rocky Mountain LLC , 2014-2592 (La. 12/8/15), 193 So.3d 1110, and citations therein. A reviewing court may not merely decide whether it would have found the facts of the case differently; the issue to be resolved on review is whether the trial court's finding was clearly wrong or manifestly erroneous. Id. ; Rosell v. ESCO , 549 So.2d 840 (La. 1989). The allocation of fault is likewise a factual finding subject to the manifest error-clearly wrong standard of review. Thompson v. Winn-Dixie Montgomery Inc. , 2015-0477 (La. 10/14/15), 181 So.3d 656. Factors which may influence the allocation of fault include whether the conduct resulted from inadvertence or involved awareness of the danger, how great a risk was created by the conduct, the significance of what was sought by the conduct, the capacities of the actors, whether superior or inferior, and any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
*207 Thompson v. Winn-Dixie Montgomery , supra ; Watson v. State Farm Fire & Cas. Ins. Co. , 469 So.2d 967 (La. 1985).
The parties presented a prodigious amount of evidence, but as we noted in the factual overview, the fundamental dispute was between the plaintiffs' expert, W.D. "Bill" Griffin, and AIX's expert, David Watson, about how the accident happened. Griffin explained the general procedure for drilling a well, casing it with cement, perforating the casing at the desired depth, fracking the formation if necessary, and pumping fluid into the well, during cleanout, to return excess sand to the surface. The paramount need in the cleanout process is to use fluid of sufficient weight to prevent reservoir gas from rising to the surface. Griffin used data from the fracking analysis finding that the Smackover reservoir pressure was 6,000 pounds per square inch; he performed a "simple" calculation showing that the completion fluid had to weigh 10.52 PPG to control this gas pressure. He conceded that 2% KCL (8.4 PPG) was "standard" in the industry, but knowing the fracking data he would have insisted on 10.5 PPG. He felt that AIX's operations manager, Andrew Imel, was not competent, either for not using the data available to him or for not knowing how to interpret it; he also felt that the plaintiff, Jackson, who was just a toolpusher, would not have had access to this data. For his part, Imel conceded that the drilling fluid proposal from Mega Fluids LLC had recommended 9.8-10 PPG fluid, but admitted he "did not know what fluid weight to use," as he had not tried to determine the bottom-hole pressure. He testified he was waiting on Graves or Jackson to tell him which fluid to use.
By contrast, Watson firmly disagreed that 2% KCL was too light to control the gas, and felt that the cause of the accident was the decision to place the pump and flowback tank too close to the well. Watson outlined general principles of petroleum geology, noting that the Smackover is subnormally pressured, exerting less pressure than a column of pure water (8.33 PPG); in such a well, 2% KCL was appropriate, as it would not contaminate the formation, and it had been used successfully in comparable nearby wells in the same formation. Watson also testified that any gas present in the rock being drilled becomes part of the drilling mud and rises naturally to the surface, but expands (a bubble 1 cubic foot at the bottom of the well becomes 24.7 cubic feet at the surface). In Watson's view, when the plaintiffs saw bubbles of this size coming to the surface, they should have immediately shut in the well, and were negligent for failing to do so. He also felt that Dykes was negligent for placing the pump and flowback tank only 6-8 feet from the well; this created a source of sparks, and should have been situated about 100 feet away.
If this court were sitting as the finder of fact, we would find both experts' analyses fairly reasonable. Griffin's math, starting with 6,000 pounds of formation pressure and yielding 10.5 PPG needed to offset it, is intuitive and seems to be supported by the drilling fluid proposal. Watson's opinion that gas from deep in the formation will inevitably rise to the top also appears intuitive, and suggests that even if heavy fluid had been used, it might not have prevented the accident. Neither expert knew precisely what ignited the gas: the nearby pump and flowback tank was a likely source of a spark, but if less gas had escaped, there might have been no explosion. What may have tipped the scales in favor of Griffin's view was Imel's candid admission that he had not looked at the fracking data and thus did not know what kind of completion fluid to use. Also, the "customary way of doing things" in the *208 oil patch may indeed be negligent. Johnson v. Harry Jarred Inc. , 391 So.2d 898 (La. App. 2 Cir. 1980). Watson and Imel's view that 8.4 PPG fluid is standard in the industry is not necessarily the end of the discussion. In short, we are unable to say the jury was plainly wrong or manifestly erroneous in accepting Griffin's analysis of how the explosion happened.
With this conclusion, we do not find the jury's allocation of fault to be plainly wrong or manifestly erroneous. The compendious testimony easily shows that AIX controlled the operation at Bud Meadors No. 3. AIX's operations manager, Imel, gave orders to the completion consultant, Graves, who relayed those orders to the toolpusher, Jackson, who, in turn, directed the crew. Imel failed to calculate the fluid weight, sent the wrong completion fluid for the job, was not aware which fluid he should have sent, and did not give Graves the data that would have enabled him to correct the problem. Notably, Imel hired Graves to work on two separate wells, and he was at the other well, on AIX's business, when the Bud Meadors No. 3 exploded. In light of AIX's superior position, control over the operation, and failure to recognize the danger posed by his action, we do not find the allocation of 97.5% fault to AIX, and only 0.5% to Graves, to be plainly wrong.
We also find no manifest error in the jury's decision to absolve Jackson, Shephard, Dykes Oil Co. and State Line Vacuum. AIX's chief argument is that somebody else was at fault for placing a pump and flowback tank too close to the well, but Imel admitted that he ordered this equipment, and AIX's lead expert, Watson, agreed that the placement was Imel's choice. AIX also offered scraps of evidence that hinted at a source of ignition. For instance, a State Line Vacuum mechanic testified that after the fire, he examined the pump and found a belt guard was rubbing the drive shaft, allowing for friction that may have caused a spark. However, he did not remember its condition before the fire, was not present when the fire occurred, and stated no opinion whether the pump actually created any sparks. By contrast, Jackson testified that he was standing next to the pump shortly before the fire, the drive shaft was not rubbing the guard, and there was nothing wrong with the pump. AIX also cites the testimony of a petroleum engineer formerly in its employ, who was actually on vacation in Mexico when the fire occurred; he testified that he visited the site after the fire and was surprised to find metal lawn chairs and cigarette butts on the site. He theorized that the metal lawn chairs could have "thrown off a spark," and raised the unspoken inference that somebody was smoking near the well. However, there was no other evidence in this mammoth record to support the suggestion that people were sitting in lawn chairs and smoking in the middle of this completion job. The jury was completely within its discretion to disregard these inferences and to absolve the plaintiffs, Dykes and State Line of liability. This assignment of error lacks merit.
Assignment 3: Denial of Daubert Motion
By its third assignment of error, AIX urges the district court erred in denying AIX and St. Paul's Daubert motion and allowing the plaintiffs' expert, Griffin, to testify regarding two "specious and unreliable theories" of liability. AIX specifically contests Griffin's view that AIX should have used a completion fluid weighing at least 10.5 PPG, and his theory, stated at the Daubert hearing, that a "sand bridge" must have formed around 11:30 the morning of the fire, trapped a large amount of *209 gas, then dispersed suddenly around 3:00 that afternoon, creating the pent-up formation that erupted and caught fire. AIX brands these views "junk science," belied by the science and history of the well, and soundly refuted by AIX's expert, Watson, who wrote a book on well control and testified that gas will rise to the surface no matter how heavy the completion fluid. AIX concludes that the legal error of allowing Griffin's testimony tainted the verdict and required de novo review, Evans v. Lungrin , 97-0541 (La. 2/6/98), 708 So.2d 731.
The principles of expert testimony are stated in La. C.E. art. 702 :
A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(2) The testimony is based on sufficient facts or data;
(3) The testimony is the product of reliable principles and methods; and
(4) The expert has reliably applied the principles and methods to the facts of the case.
Before an expert's opinion is admitted, the trial court is required to perform a gatekeeping function to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. Daubert v. Merrell Dow Pharms. Inc. , 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ; Pratt v. Culpepper , 49,627 (La. App. 2 Cir. 2/27/15), 162 So.3d 616. In performing this function, the court should consider (1) the "testability" of the scientific theory or technique, (2) whether the theory or technique has been subjected to peer review and publication, (3) the known or potential rate of error, and (4) whether the methodology is generally accepted in the scientific community. Independent Fire Ins. Co. v. Sunbeam Corp. , 99-2181 (La. 2/29/00), 755 So.2d 226, Prod. L. Rep. (CCH) ¶ 15,803. The admission of expert testimony is proper only if all three of the following are true: (1) the expert is qualified to testify competently regarding the matters he intends to address, (2) the methodology by which he reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated in Daubert , and (3) the testimony assists the trier of fact, through the application of scientific, technical or specialized expertise, to understand the evidence or to determine a fact in issue. Cheairs v. State , 2003-0680 (La. 12/3/03), 861 So.2d 536. Ultimately, the weight given to expert testimony depends on the facts on which it is based as well as the professional qualifications and experience of the expert. Meany v. Meany , 94-0251 (La. 7/5/94), 639 So.2d 229 ; Ryan v. Case New Holland Inc. , 51,062 (La. App. 2 Cir. 12/22/16), 211 So.3d 611.
At the Daubert hearing, Griffin testified that he majored in chemical engineering, had worked in the petroleum industry since 1972, when he joined Amoco, had taken petroleum engineering classes at Texas Tech, and had run his own consulting firm since 1999. A major component of his method is to examine the history of the well to determine the proper fluid, and he reviewed the mud logs of Bud Meadors No. 3, finding that before the fire, the well was clogged with sand. He discussed the difference between drilling mud and completion fluid, and noted that after the fire, a different contractor, Schlumberger, used heavier fluid to complete the circulation. He theorized that a "sand bridge" might have formed, trapping gas; however, he felt that the drilling data (as well as AIX's expert, Watson) showed excess sand was *210 present and was the reason why circulation was needed. On cross-examination, he admitted that most wells do not form sand bridges, and, if one did not form, an 8.43 PPG completion fluid would have sufficed.
Griffin established his education in engineering, his experience and training in petroleum engineering, his close scrutiny of the facts of the case, and his application of principles of petroleum engineering to these facts, thus satisfying three of the four elements of La. C.E. art. 702. His ultimate conclusions, that 10.5 PPG fluid was needed and that a "sand bridge" formed trapping the gas that later escaped and caught fire, are probably not subject to peer review and publication. Notably, Griffin downplayed the sand bridge theory in his trial testimony.
On this record, we do not find the district court abused its discretion in allowing Griffin to express his opinion. In light of his credentials and the importance of the issue to the case, the court was entitled to let the jury hear Griffin's opinion and give it appropriate weight vis-à-vis the documentary evidence, lay testimony and the other expert's opinion. This assignment of error lacks merit.
Assignment 4: Jackson's Damages
By its fourth assignment of error, AIX urges the jury erred in awarding Jackson $3 million in general damages, $1.5 million in loss of future earning capacity and $1 million in future medicals. AIX argues that Jackson sustained second degree burns to only 10% of his body (trunk, back, arms, legs), and spent 11 days in the LSU burn unit. He did well, and by August 28 (two months post-accident), Dr. Sittig, chief medical director at University Health, told him he could return to work, with the modest precaution of wearing sunblock or clothing sufficient to cover the burned areas; on October 1, he released Jackson with no recommendations for future treatment. AIX submits that for serious but well-healed burns like Jackson's, the maximum award should be $500,000. Jones v. CenterPoint Energy Entex , 2011-0002 (La. App. 3 Cir. 5/25/11), 66 So.3d 539, writ denied , 2011-1964 (La. 11/14/11), 75 So.3d 946 ($500,000) ; Thomas v. State , 27,203 (La. App. 2 Cir. 10/12/95), 662 So.2d 788, ($750,000) ; Castay v. ADM Growmark River Sys. Inc. , 00-1489 (La. App. 5 Cir. 3/14/01), 785 So.2d 47, writs denied , 2001-1058, -1079 (La. 6/1/01), 793 So.2d 196, 199 ($750,000). As to earning capacity, AIX shows that Jackson missed just one paycheck and has returned to work in the oilfield; it contends he is now making more money than before, which refutes any loss of earning capacity. As to future medicals, AIX argues that the plaintiffs' lead witness, Dr. Shelly Savant, was not Jackson's treating physician, and her estimate included many life-care items that were medically unsubstantiated. AIX submits that her summary was at least $717,000 higher than medically necessary.
One damaged through the fault of another is entitled to full indemnification for the damages caused thereby. La. C.C. art. 2315 ; Wainwright v. Fontenot , 2000-0492 (La. 10/17/00), 774 So.2d 70. General damages are those which may not be fixed with pecuniary exactitude; instead, they involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be definitely measured in monetary terms. Bellard v. American Cent. Ins. Co. , 2007-1335 (La. 4/18/08), 980 So.2d 654. The trier of fact has vast discretion in fixing general damage awards. La. C.C. art. 2324.1. This vast discretion is such that an appellate court should rarely disturb an award of general damages. Hae Woo Youn v. Maritime Overseas Corp. , 623 So.2d 1257 (La. 1993), cert. denied , *211 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The role of the appellate court in reviewing general damage awards is not to decide what it considers an appropriate award, but to review the exercise of discretion by the trier of fact. Id. at 1260 ; Terry v. Simmons , 51,200 (La. App. 2 Cir. 2/15/17), 215 So.3d 410.
Loss of earning capacity is not the difference between what the plaintiff earned before and after the accident. Ryan v. Zurich American Ins. Co. , 2007-2312 (La. 7/1/08), 988 So.2d 214. Damages should be estimated on the injured person's ability to earn money, rather than what he actually earned before the injury. Fecke v. Board of Supervisors , 2015-1806 (La. 9/23/16), 217 So.3d 237. In fact, a plaintiff who is earning more money after the accident may still prove a loss of earning capacity. Hobgood v. Aucoin , 574 So.2d 344 (La. 1990). The theory is that the injury has deprived him of a capacity that he would have been entitled to enjoy even though he never profited from it monetarily. Id. Awards for loss of earning capacity are inherently speculative and insusceptible of calculation with mathematical certainty. Williams v. Board of Supervisors , 48,763 (La. App. 2 Cir. 2/26/14), 135 So.3d 804, writ denied , 2014-0666 (La. 5/2/14), 138 So.3d 1249, and citations therein. The trier of fact is accorded great discretion in assessing damages for loss of earning capacity, but there must be a factual basis in the record for the award. Ryan v. Zurich American Ins. Co. , supra ; Williams v. Board of Supervisors , supra .
A tort victim may also recover for his future medical expenses. Menard v. Lafayette Ins. Co. , 2009-1869 (La. 3/16/10), 31 So.3d 996. The victim must establish the probability of future medical expenses with supporting medical testimony and estimations of their probable cost. The proper standard for determining whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence that those expenses will be medically necessary. Id. An award for future medical expenses is by nature highly speculative and not susceptible to calculation with mathematical certainty. Id. Such awards generally do not involve determining the amounts, but turn on questions of credibility and inferences, as such which side's experts and other witnesses the jury believes. Id. , citing Frank L. Maraist & Thomas L. Galligan Jr., La. Tort Law § 7.02[1], 7-4 (Michie 2009).
Jackson testified that the gas hit him "full force," not just a bubble, and knocked him into a pile of dirt, where he was "burning and beating" his face, screaming, and when he finally got his shirt off, "my skin * * * was just hanging on both sides." After a wait that seemed "like it was just forever," an ambulance arrived, but did not have enough morphine to ease his pain. The fire department airlifted him to LSU Medical Center, where he stayed 11 days, undergoing daily hydrotherapy to wash off dead tissue; he was diagnosed with pulmonary collapse, and with burns and swelling to his face and mouth so severe that he was placed on a pediatric diet. Dr. Darrell Henderson, a plastic and reconstructive surgeon in Lafayette, La., began treating Jackson in November 2013. He found severe, deep, second-degree burns from Jackson's neck down to his buttocks and most severe burns (80-90% deep) to his upper left shoulder. By contrast, AIX's expert, Dr. Kevin Mark Sittig, of University Health in Shreveport, testified that Jackson suffered second-degree burns to only 10% of his body (trunk, back, arm, legs), diminished motion to his left elbow and a damaged left cornea; further, he progressed very well, and soon returned to work. Dr. Sittig noted some "stippling pigmentation" or "color *212 changes" in Jackson's scars, but no functional limitation, and necessitating no more than protection against UV radiation. Jackson testified that even after his recovery and return to work, he loses his breath easily and gets depressed.
In light of Jackson's graphic description of the explosion, the agonizing pain of being burned in the face and upper body, the course of therapy at LSU, residual scarring, occasional depression and shortness of breath, we cannot say the jury abused its discretion in awarding him $3 million in general damages. We recognize that Jackson has made a remarkable recovery and missed very little work. With the district court, we agree that the award is "extremely high," but we cannot say it is beyond the discretionary range. This portion of the assignment of error lacks merit.
As for Jackson's future medical expenses, the plaintiffs' expert life care planner, Dr. Savant, testified that she compiled a plan in conjunction with another certified life care planner, Dr. Gorman, and reviewed the medical records of Jackson's treating physicians, Drs. Henderson, Krusz, Mears, Mody and Haber; the first two of these testified at trial that they agreed with Dr. Savant's plan. The total estimate for Jackson's future medicals was $1,155,422.20. AIX's expert, Elizabeth Martina, testified that Jackson needed no vocational rehab, only modest therapy, and no more medical treatment than an annual trip to a dermatologist. Her total estimate for Jackson's future medicals was $48,000.
Obviously, the jury saw the gaping difference and made a factual finding. We agree with AIX's observation that certain elements of Dr. Savant's plan seem overstated, such as four internal medicine exams per year for the rest of his life, household assistance, gym membership, and diagnostic imaging. At the same time, we recognize that any such award is by nature speculative and hinges on questions of credibility and inferences. Menard v. Lafayette Ins. Co. , supra . Dr. Savant's video deposition was comprehensive and she equably answered cross-examination about every line item, agreeing that two could be removed. The jury obviously made an adjustment to her estimate by deducting about $155,000 from it. We would again echo the district court's observation that this award is "extremely high," but we cannot say it is an abuse of discretion. This portion of the assignment of error lacks merit.
The final portion of the assignment of error challenges the loss of earning capacity. There is no merit to AIX's contention that because Jackson missed very little work, and now reportedly earns more than he did before the accident, he proved no loss of earning capacity. Hobgood v. Aucoin , supra . The record supports a finding that Jackson will not, over the balance of his work life, be able to pursue his employment as vigorously and energetically as he could before the accident. However, on close examination, this record contains no factual basis to support the award of $1.5 million. The plaintiffs' expert economist, Dr. Tim Shaughnessy, evaluated Jackson's life care plan but made no statement about his income, current or future potential. Jackson did not testify how much money he currently makes, and we do not find any other evidence, such as tax returns, to show his income level. At the time of trial, Jackson was 43 years old, with a work life expectancy of 22 years. The jury's award of $1.5 million compensates him over $68,000 per year for the rest of his work life, an amount that simply has no basis in the record.
In Hobgood v. Aucoin , supra , the plaintiff, who ran an oil well service business, *213 injured his hand in a car accident in 1982. The jury found that he proved a loss of earning capacity. The record showed that between 1982, the year of the accident, and 1986, his income grew from $77,000 to $92,000, although his expert economist testified that his earnings were diminished $37,500 annually because of the injury. The Supreme Court affirmed an award of $50,000 for loss of earning capacity. In Coco v. Winston Indus. Inc. , 341 So.2d 332 (La. 1977), the plaintiff was a 20-year old laborer who severely injured his right hand; his expert economist projected an annual loss of $5,000 a year; the Supreme Court affirmed an in globo award of $350,000 for all general and special damages, and gave "considerable weight" to the expert's opinion. In Philippe v. Browning Arms Co. , 395 So.2d 310 (La. 1980), the plaintiff was a dentist who lost his right thumb when his shotgun accidentally discharged. He could no longer work as a dentist, making roughly $45,000 a year between 1972 and 1976, but became a dental consultant, making $10,000 a year in 1977. His expert economist projected his future lost income at between $716,908 and $970,165; the Supreme Court affirmed an award of $800,000.
In light of the record's silence as to Jackson's wages and earning capacity, the award of $1.5 million is unsupported and a plain abuse of discretion. However, in light of the scale of the awards affirmed in Hobgood , Coco and Philippe , the earning potential of toolpushers in north Louisiana, and the modest-to-moderate diminution of Jackson's ability to work shown at trial, we find that the highest possible award within the jury's discretion is $600,000, or roughly $27,000 a year in lost earning capacity. This portion of the assignment of error has merit, and the judgment will be amended accordingly.
Assignment 5: Shephard's Damages
By its fifth assignment of error, AIX urges the jury erred in awarding Shephard $7.5 million in general damages, $2 million in lost future wages, and $7.5 million in future medical expenses. AIX shows that Shephard sustained second degree burns to 33-49% of his body, including parts of his face, neck, flank, shoulders, forearms and legs. After the fire, he was airlifted to the LSU burn unit, where he spent one month, and then to Life Care, so his second degree burns could heal; while there, he experienced posterior reversible encephalopathy syndrome ("PRES"), but this resolved, and he was released on October 3, 2013. At that point, according to Dr. Sittig, the chief medical director at University Health and Shephard's treating physician at LSU, no further treatment was needed. AIX concedes that Shephard then went to Dr. Henderson, who performed four procedures, but then released him to full-time, indoor work; since June 2016, he has worked from home as a telemarketer. AIX argues that comparable burn patients have received no more than $2 million, Scarberry v. Entergy Corp. , 2013-0214 (La. App. 4 Cir. 2/19/14), 136 So.3d 194, writs denied , 2014-0566, -0599 (La. 5/16/14), 139 So. 3d 1026 ($4.75 million); Bonin v. Ferrellgas Inc. , 2002-1031 (La. App. 3 Cir. 8/6/03), 855 So.2d 781, rev'd as to liability , 2003-3024 (La. 7/2/04), 877 So.2d 89 (five plaintiffs, $1.75 to $3 million each); Bujol v. Entergy Servs. Inc. , 2000-1621 (La. App. 1 Cir. 8/14/02), 833 So.2d 947, rev'd as to liability , 2003-0492 (La. 5/25/04), 922 So.2d 1113 ($5 million reduced to $1.75 million). As to future lost wages, AIX argues that the plaintiffs' expert economist, Dr. Shaughnessy, projected these at $1.65 million if Shephard worked part-time, and $1.375 million if he worked full-time, so the award of $2 million exceeds his own expert's highest estimate by almost *214 $350,000; also, Dr. Shaughnessy included fringe benefits that Shephard had never received in his employment. As to future medicals, AIX argues that as Shephard's past medicals were only $235,438, Dr. Savant's projection of over $9 million is outlandish, including dubious items such as plan administration expenses ($678,750), back surgery and 92 MRIs, physical therapy (over $1.7 million), medications (over $2.9 million), and lab tests ($120,000). AIX submits that unsubstantiated items in Dr. Savant's estimate exceed $6 million.
The record shows that Shephard took the direct blast of a gas fire. One of his coworkers described Shephard's coveralls and boots as "melted" and "peeling off" him; the first paramedic to arrive said, "This is the one they told you you'd probably never see": skin flaking off his face and arms, and all the morphine in the ambulance "didn't touch" the pain. Shephard was almost unable to describe the horrific experience, but he saw his skin falling off and "couldn't escape the pain." He was treated at the hospital for four months, has undergone four surgeries (Z-plasty, skin grafts, reconstruction of his lip), and, according to Dr. Henderson, will require additional skin grafts every 18 months to maintain his skin, and will likely lose his left ear. One of plaintiffs' experts, Dr. Eduardo Gonzales-Toledo, a neuroradiologist at LSU, diagnosed him with traumatic brain injury ; another, Dr. Claude Krusz, a neurologist, found post-concussion syndrome, requiring a lifetime of care and followup treatment; Dr. Henderson predicted severe pain and cognitive impairment for the rest of Shephard's life. Shephard confirmed that he overheats easily, his back hurts, his memory is horrible, and he gets frequent headaches.
AIX's experts disputed much of this. Dr. William Hickerson, a plastic surgeon, felt that Shephard needed no further skin grafts, any problem areas could be treated conservatively with CO2 ablation, and he would have no work restrictions. Dr. Mark Barisa, a neuropsychologist at Baylor University, reviewed the same tests as did Dr. Gonzales-Toledo, and agreed with the diagnosis of PRES early on, but felt Shephard had recovered from it; he found a possible posttraumatic stress disorder, but disagreed with the diagnosis of traumatic brain injury. Dr. Robert Zimmerman, a neuroradiologist at Rutgers University, confirmed the early diagnosis of PRES, from which Shephard should recover, but disputed, on scientific grounds, Dr. Gonzales-Toledo's use of the cortical thickness MRI and fMRI to diagnose traumatic brain injury. Dr. Sittig, who treated Shephard at LSU, opined that the patient was "completely healed," needing no further surgeries, therapy or household services, his only work limitation being to use sunblock if working outdoors.
The jury heard and observed Shephard testify, and then heard several days of intricate, contradictory medical opinions, before concluding that the injuries were horrific and the consequences much more painful, persistent and life-altering than depicted by AIX's experts. We find no abuse of discretion in the award of general damages. This portion of this assignment of error lacks merit.
As for the award of future medical expenses, this court would reiterate its observations about Dr. Savant's testimony with respect to Jackson: she utilized projections from some of Shephard's treating physicians, explained them in some detail, and answered thorough cross-examination about each item. Sitting as a factfinder, this court would likely agree that some of her projections seem extravagant: after 2½ years of intense treatment, his past medical expenses totaled only $235,000, but Dr. *215 Savant projected future medicals of $2.9 million, and we would question whether any human being would submit to 92 MRIs in the course of a lifetime. We observe, however, that the jury accepted that Shephard's injuries were more, rather than less, severe and permanent, so it was not an apparent abuse of discretion to accept the view that his future medical demands would be higher, rather than lower. The jury obviously discounted some of Dr. Savant's estimate, as her total was $9.3 million. The plan administration expense, $678,750, is enormous, but with the size of the award and Shephard's likely lack of sophistication in financial matters, it seems warranted in this case. With the district court, we agree that the final award, $7.5 million, is "extremely high," but on this record we cannot say it is an abuse of discretion. This portion of the assignment of error lacks merit.
The final portion of the assignment challenges the award of future lost wages. A plaintiff bears the burden of proving his claim for lost earnings; the amount need not be proved with mathematical certainty, but by such proof as reasonably establishes the claim. Davis v. Foremost Dairies , 45,835 (La. App. 2 Cir. 2/16/11), 58 So.3d 977, writs denied , 2011-0568, -0538 (La. 4/25/11), 62 So.3d 97, 98, and citations therein. Awards for future lost income are inherently speculative and intrinsically insusceptible of being calculated with mathematical precision; the courts must exercise sound judicial discretion to determine these awards. Id. The award must be consistent with the record. Purely conjectural or uncertain future lost earnings will not be allowed. Id. ; Lasha v. Olin Corp. , 91-459 (La. App. 3 Cir. 3/2/94), 634 So.2d 1354.
Unlike the situation with Jackson, the record is replete with economic evidence concerning Shephard. Dr. Shaughnessy, the plaintiffs' expert economist, carefully calculated that if Shephard is able to work full-time, his loss will be $1,375,242; if able to work only half-time, his loss will be $1,650,030. AIX's expert economist, Dr. George Rice, calculated that if Shephard cannot work, his lost earnings will be $1,396,790; with some training, his loss would be only $474,439. The jury awarded $2 million, which patently exceeds any expert's projection.
By reply brief, the plaintiffs submit the jury was entitled to exercise its discretion, in light of the testimony that even if Shephard can work, he will be frequently absent because of necessary surgeries, MRIs, therapy and other medical matters, and this justified the jury's decision to exceed the expert testimony. While the award is inherently speculative, it must be consistent with the record. Davis v. Foremost Dairies , supra . To affirm an award that exceeds the plaintiffs' own expert by nearly $350,000 would unmoor the judgment from the foundations of record evidence. We also consider the "extremely high" elements of the award, and the fact that the plaintiffs had ample opportunity to present Dr. Shaughnessy with all employment alternatives. The jury plainly abused its discretion. This portion of the judgment will be amended to the highest award supported by the record, $1,650,030.
Assignment 6: Postjudgment interest
By its sixth assignment of error, AIX urges the court erred in casting St. Paul for postjudgment interest on the full amount of the judgment rendered, $22,938,030, even though the plaintiffs' recovery was limited to a judgment against St. Paul for its policy limits, $10,965,000. AIX argues that this violates the bankruptcy court's order limiting recovery to "the Debtor's liability insurance policies and proceeds" as well as St. Paul's policy, which provides (with emphasis added ):
*216 Postjudgment interest . We'll pay the interest that accumulates after a judgment on the full amount of the judgment against the protected person from the date of judgment to the date we pay * * *. But if we don't pay part of the judgment for any reason other than it's more than the limit of coverage that applies, we don't pay the postjudgment interest that accumulates on that part of the judgment.
AIX contends that the policy does not provide for the payment of postjudgment interest "on some theoretical judgment" that may have been assessed against AIX, but for bankruptcy, and concludes that the judgment is erroneous and must be amended to award interest only on the remaining policy limits.
An insurance policy is a contract between the parties and should be construed using the general rules of interpretation set out in the Civil Code. Sensebe v. Canal Indem. Co. , 2010-0703 (La. 1/28/11), 58 So.3d 441 ; Edwards v. Daugherty , 2003-2103 (La. 10/1/04), 883 So.2d 932. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046 ; Sensebe v. Canal Indem. Co. , supra . Insurers are entitled to limit their liability and to impose reasonable conditions upon the policy obligations absent a conflict with statutory provisions or public policy. In re Katrina Canal Breaches Litigation , 2010-1823 (La. 5/10/11), 63 So.3d 955. Because insurance policies are adhesionary in nature, any contradiction or ambiguity in the contract must be strictly construed against the insurer, the party who drafted the policy. La. C.C. art. 2056 ; In re Katrina Canal Breaches Litigation , supra . However, the fact that a policy provides general coverage, but then subjects it to certain exclusions, does not make the policy ambiguous. Bilyeu v. National Union Fire Ins. Co. of Pittsburgh, Pa. , 50,049 (La. App. 2 Cir. 9/30/15), 184 So.3d 69, 60 Emp. Ben. Cas. 2977, writ denied , 2015-2277 (La. 2/19/16), 187 So.3d 462, and citations therein.
We have closely read the postjudgment interest provision of St. Paul's policy. The first sentence, agreeing to pay "interest that accumulates after a judgment on the full amount of the judgment" against the insured, clearly obligates St. Paul to pay postjudgment interest. Dekeyser v. Automotive Cas. Ins. Co. , 97-1251 (La. App. 4 Cir. 2/4/98), 706 So.2d 676, overruled on other grounds , Champagne v. Ward , 2003-3211 (La. 1/19/05), 893 So.2d 773. However, the second sentence denies postjudgment interest if the insurer does not pay a portion of the judgment "for any reason other than it's more than the limit of coverage that applies." This must be construed as an exception or exclusion from the general coverage provided in the first sentence. Moreover, St. Paul was excused from paying a portion of the judgment because of the bankruptcy court's order, reached by consent of the parties, which is plainly something other than the fact that the judgment exceeded policy limits. The district court committed legal error in holding otherwise.
This assignment of error has merit. The judgment will be amended to limit postjudgment interest to the final amount of the judgment.
Assignment 7: Defense of Exclusive Remedy
By its seventh assignment of error, AIX urges the trial court erred in denying AIX's exception of no right of action and alternative motion to reopen or supplement the record, pleadings that asserted the exclusive remedy of workers' compensation. AIX argues that the plaintiffs were its statutory employees, under *217 the two-contract theory of La. R.S. 23:1061 A(2), and thus their only right of action against AIX was in comp. Naiman v. Goldsberry Oper. Co. , 43,266 (La. App. 2 Cir. 6/11/08), 987 So.2d 326. AIX concedes there is "conflicting jurisprudence" as to whether the exclusive remedy can be raised as an exception of no right of action and can be waived by failure to assert it before trial. However, it contends that "as a matter of law, the parties could not waive the workers comp remedy," citing Locker v. Wilson , 536 So.2d 441 (La. App. 2 Cir. 1988), writ denied , 537 So.2d 210 (1989).
Contrary to AIX's assertion, there is no conflict in the jurisprudence. The courts have consistently held that the exclusive remedy of the workers' compensation act is an affirmative defense. Brown v. Adair , 2002-2028 (La. 4/9/03), 846 So.2d 687 ; Comet Drilling Co. v. Tri-State Oil Tool Indus. Inc. , 337 So.2d 567 (La. App. 2 Cir. 1976) ; Teasley v. Ates , 2003-824 (La. App. 3 Cir. 12/10/03), 861 So.2d 778, writ denied , 2004-0092 (La. 3/19/04), 869 So.2d 855. The affirmative defense must be specially pled in the answer and proved at trial. La. C.C.P. art. 1005 ; Grant v. Sneed , 49,511 (La. App. 2 Cir. 11/19/14), 155 So.3d 61 ; Teasley v. Ates , supra . Failure to do so constitutes waiver. Frazier v. Green Steel Bldg. , 409 So.2d 1290 (La. App. 2 Cir. 1982) ; Teasley v. Ates , supra .
AIX filed this exception and motion over one month postverdict. The affirmative defense was therefore waived. The district court did not err in denying the exception and motion. This court would add that in Locker v. Wilson , supra , the opinion clearly stated, "Wilson moved for summary judgment, urging he was the employer or statutory employer of Locker." In other words, the defendant timely asserted the exclusive remedy. AIX did not.
This assignment of error lacks merit.
Assignment 8: Improperly Impaneled Jury
By its eighth assignment of error, AIX urges the trial court erred in denying AIX's motion to nullify the jury's verdict. AIX argues the jury was improperly impaneled in that one juror, Ms. Moore, "may not have been" a resident or domiciliary of Caddo Parish, as required by La. Const. art. V, § 33 (A) and La. C. Cr. P. art. 401 (made applicable to civil trials by La. R.S. 13:3041 ). After trial, AIX "inadvertently" discovered facts "suggesting" that Ms. Moore was not a resident or domiciliary of Caddo Parish: she signed an affidavit stating that she was a resident of Bossier Parish, but then signed another affidavit contradicting this. AIX argues that an improperly constituted jury negates its right to a fair trial and requires this court to nullify the verdict and remand for a new trial.
A citizen of Louisiana who has reached the age of majority is eligible to serve as a juror in the "parish in which he is domiciled." La. Const. art. V, § 33 (A). A juror must have "resided within the parish in which he is to serve as a juror for at least one year immediately preceding his jury service." La. C. Cr. P. art. 401. The qualifications of a juror in any civil case are governed by Art. 401. La. R.S. 13:3041 B.
To warrant a new trial based on juror disqualification, a party must show the exercise of reasonable diligence to discover the disqualification before verdict. State v. Brown , 557 So.2d 1085 (La. App. 2 Cir. 1990) ; Simoneaux v. Amoco Prod. Co. , 2002-1050 (La. App. 1 Cir. 9/26/03), 860 So.2d 560, 160 Oil & Gas Rep. 1077, writ denied , 2004-0001 (La. 3/26/04), 871 So.2d 348. In order to take advantage of the defect and receive a new trial, the party must establish that he was not aware *218 of the disqualification and that this information could not have been ascertained by due diligence. State v. Baxter , 357 So.2d 271 (La. 1978) ; Simoneaux v. Amoco Prod. Co. , supra . Specifically, the moving party must show that he exercised such diligence "by an examination of the juror, on his voir dire, touching on his qualifications, and that he answered falsely." State v. Baxter , supra .
We have closely examined the transcript of the voir dire. It does not show that AIX ever asked Ms. Moore about her residence. The issue was therefore waived, and the district court did not err in denying the motion to nullify verdict. We would note that the affidavits, and the testimony at the hearing, which we will not belabor, do not create any serious likelihood that the jury was improperly constituted. Further, only nine jurors were required to render this civil verdict. La. C. C. P. art. 1797 B. The minutes show that this verdict was unanimous. Any error with regard to one juror would be harmless. Simoneaux v. Amoco Prod. Co. , supra .
This assignment of error lacks merit.
DECREE
For the reasons expressed, we affirm the jury's findings and allocation of fault, its awards of general damages and future medical expenses, and the district court's rulings on the various motions contested in this appeal. We amend, however, the jury's awards of Jackson's loss of future earning capacity to $600,000, and of Shephard's future lost wages to $1,650,030. The judgment against St. Paul is amended to reduce the final awards proportionately.[3] We also amend the judgment to award postjudgment interest only on the final judgments, as reduced by the bankruptcy court order. The first, second, fourth, fifth and sixth paragraphs of the judgment are amended and rendered as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff Jeremy Shephard and against defendant AIX Energy Inc. in the sum of SEVENTEEN MILLION, ONE HUNDRED THIRTY THOUSAND, FOUR HUNDRED SIXTY-EIGHT & 03/100 ($17,130,468.03) dollars, plus legal interest, this judgment being unenforceable against AIX Energy Inc. pursuant to the ruling in the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division, In re: AIX Energy, Chapter 11, Case No. 15-34245, that plaintiff's recovery from AIX Energy Inc. is limited to AIX Energy Inc.'s liability insurance proceeds as set forth below.
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff Jeremy Shephard against defendant St. Paul Fire & Marine Insurance Company in the sum of SEVEN MILLION, NINE HUNDRED EIGHTY-THREE THOUSAND, EIGHT HUNDRED EIGHTY-SIX & 75/100 ($7,983,886.74) dollars, plus legal interest from date of judicial demand until paid.
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff Emily Shephard against defendant St. Paul Fire & Marine Insurance Company in the sum of TWO
*219 HUNDRED THIRTY-THREE THOUSAND, FIVE HUNDRED FIFTY-FOUR DOLLARS & 50/100 ($233,554.50) dollars, plus legal interest from date of judicial demand until paid.
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff Michael Jackson against defendant AIX Energy Inc. in the sum of FOUR MILLION, SIX HUNDRED FORTY-FIVE THOUSAND, SEVEN HUNDRED FORTY-SEVEN & 16/00 ($4,645,747.16) dollars, this judgment being unenforceable against AIX Energy Inc. pursuant to the ruling in the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division, In re: AIX Energy, Chapter 11, Case No. 15-34245, that plaintiff's recovery from AIX Energy Inc. is limited to AIX Energy Inc.'s liability insurance proceeds as set forth below.
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff Michael Jackson against defendant St. Paul Fire & Marine Insurance Company in the sum of TWO MILLION, ONE HUNDRED SIXTY-FIVE THOUSAND, TWENTY-NINE & 03/100 ($2,165,029.03) dollars, plus legal interest from date of judicial demand until paid.
The other paragraphs of the judgment are affirmed. Appellate costs are to be paid 97.5% by AIX Energy and St. Paul Fire & Marine Insurance Co., and 2.5% by the plaintiffs, Jeremy Shephard and Michael Jackson.
AFFIRMED IN PART; AMENDED IN PART; RENDERED .

The court dismissed Jackson's wife's claim for loss of consortium by motion for directed verdict, a ruling not challenged on appeal.

Emily Shephard was awarded $233,554, using the same formula, against St. Paul, and La. Workers' Compensation Corporation was awarded reimbursement under a workers' comp lien, items not contested on appeal.

The jury awarded Shephard a total of $17,480,438.03; applying a formula pursuant to the bankruptcy order, the court ordered St. Paul to pay him $8,146,995.00. The amended verdict awards Shephard a total of $17,130,468.03, or 0.979979 of the jury's verdict. Applying the same ratio to this court's final award yields $7,983,886.74. The jury awarded Jackson $5,545,747.16; the final judgment against St. Paul was $2,584,450.50. The amended verdict is $4,645,747.16, or .837713 of the jury's verdict. Applying this ratio to this court's final award yields $2,165,029.03.